**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **DOH OIL COMPANY**, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **No. MO:22-CV-58-DC** |
| | § | |
| **AARON KAHLE**, *et al.*, | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION

The landscape of the oilfield in West Texas at any given time includes landmen scurrying to and from county courthouses, digging through property records and tracing convoluted chains of title to minerals. On occasion, flipping through the voluminous instruments and dusty books of record, a gem—a defect in title—might appear. Perhaps it takes the form of an invalid deed, or maybe a will and testament improperly construed. Regardless, a title defect presents an opportunity to seek a piece of the revenue pie and feeds the seemingly insatiable appetite of oil and gas litigation.

The landman untangles the history of mineral rights, following the rabbit trail of transfers and devises, hunting down potential adverse claimants to title—a laughing heir, a successor to the grantee or grantor under a decades-old deed—offering to buy the minerals. The acquiring party then sues the interest owners of record claiming superior title.

Courts decipher the parties' intent based on the language used in grants or reservations and legal interpretations of words that once went uncontested. Sometimes they win. Sometimes they lose. Does this practice inject uncertainty into established chains of title? Or does it bring clarity to mineral transfers by resolving interpretative problems and settling ownership disputes so that operators can confidently pay out proceeds from the sale of oil and gas production? These questions, tangential to the case at bar, are not for this Court to decide.

Plaintiffs DOH Oil Company ("DOH") and Craig A. Johnson (collectively, "Plaintiffs") bring suit against Defendants Aaron Kahle; Steve Kerrigan; Stephen Yerkovich; Ridgefield Permian Minerals, LLC ("Ridgefield"); Barbara Sue O'Neil, individually and as co-trustee of the O'Neil Family Mineral Trust; Richard K. O'Neil, individually and as co-trustee of the O'Neil Family Mineral Trust; C. Megan Brenner; Robert Pike; David Pike; Jim Hall; Donna Larson; Albert Benjamin Ramsey; Victor Green; Laura Holmes Peters; and Dawn Enright Gee (collectively, "Defendants") for civil RICO claims and various state tort claims. Plaintiffs allege Defendants executed and recorded 31 bogus mineral deeds in the county records purporting to cover Plaintiffs' property interests, which Defendants purportedly knew to be invalid thereby clouding Plaintiffs' rightful title. Plaintiffs also contend Defendants sent these documents by mail and wire to operators, causing Plaintiffs' royalty revenues to be suspended. Then, Defendants sued Plaintiffs in state court to resolve the purported title disputes.[1]

Distilled down, Plaintiffs complain about commonplace conduct pervading the Texas oil and gas industry: a company uses landmen to find and acquire mineral interests based on purported defects in recorded chains and then initiates title litigation in state court to resolve ownership. This suit, at its core, is a dispute over title. To construe the facts alleged in Plaintiffs' complaint as supporting a civil RICO claim would have the effect of chilling oil and gas litigation. No matter how nefarious Plaintiffs choose to characterize Defendants' conduct, these allegations cannot support a civil RICO claim. After a de novo review of the record, the Court finds dismissal of Plaintiffs' RICO claims appropriate and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## SUMMARY

---

[1] (Doc. 1 ¶¶ 68, 75, 88, 90, 93, 105–06, 123, 152–55).

Plaintiffs allege two distinct RICO schemes, although the Report and Recommendation ("R&R") seemingly conflates them into a single scheme. First, Plaintiffs claim mail and wire fraud. But Defendants' purportedly fraudulent conduct in acquiring and selling interests between each other, filing deeds in the property records to establish their adverse chain of title, and notifying operators of a title dispute, was not directed at Plaintiffs. So, these actions cannot form the basis for Plaintiffs' civil RICO claims. Plaintiffs' argument that Defendants engaged in a pattern of racketeering to gain or maintain control of an enterprise comprised of *themselves* is counterintuitive. Second, Plaintiffs claim extortion. However, alleging a scheme to extort money through the filing of malicious lawsuits, including the threat to litigate and attempts to settle, does not establish a pattern of racketeering activity.[2] This illustrates the frailty of Plaintiffs' pleadings.

What's more, compelling policy arguments undermine the Magistrate Judge's recommendation that this case should continue past the pleading stage. First, if the mere occurrence of litigation were adequate to state a RICO claim, every unsuccessful title suit could generate retaliatory action, inundating the federal courts with procedurally complex RICO pleadings.[3] Permitting RICO suits premised on state court title disputes engenders wasteful litigation wherein each party claims the opponent's previous actions were malicious and meritless. Endorsing this expansive interpretation of RICO would discourage oil and gas litigation and frustrate the well-established public policy goal of maintaining open access to the courts, as state court title litigation could escalate to momentous RICO liability.[4] The Court cannot agree that state court litigation brought to quiet title to contested mineral interests on its own substantiates racketeering activity. Thus, Plaintiffs' civil RICO claims fall flat.

---

[2] *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1088 (11th Cir. 2004); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003).
[3] *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018).
[4] *Engel v. CBS, Inc.,* 182 F.3d 124, 129 (2d Cir. 1999).

The Court also disagrees that merely because Plaintiffs cry injury, their civil RICO claims should survive dismissal. This recommendation is conclusory. The R&R points to the following facts: "the continuing title clouds on Plaintiffs' mineral interests, loss of income after the operators of Plaintiffs' interests suspended their revenues without interest, and the legal fees that Plaintiffs have been forced to expend in the state court litigation." (Doc. 1 at 42). Significantly, these same facts are present in every title lawsuit and do not further the claim that Plaintiffs have suffered an injury *because of a RICO violation*. While the Court agrees with the Magistrate Judge's broad statement that a cloud on Plaintiffs' title impacts their property interests and suspended revenues as well as the general proposition that legal fees are calculable, such universal injuries are present in nearly all oil and gas litigation and lend nothing to establishing a particularized RICO injury.

It is not enough for Plaintiffs to show Defendants have asserted an adverse chain of title to Plaintiffs' ownership claim in state court litigation that clouds title and results in the suspension of royalty revenue. There is simply no nexus between Plaintiffs' alleged injuries and any racketeering activities. Thus, Plaintiffs fail to allege how Defendants' acquisition of purported mineral interests adverse to Plaintiffs' chain of title and any pattern of racketeering or RICO enterprise caused an independent injury apart from the universal harms of clouded title, suspended royalty payments, and legal fees, present in most oil and gas lawsuits. Such allegations are clearly insufficient. Because the R&R recites the legal elements of RICO without explaining what additional injury resulted from the pattern of racketeering or any defendant's interest or control of the enterprise, it must be rejected.

Plaintiffs simply claim that the RICO schemes themselves caused injury. Plaintiffs have not alleged an injury distinct from the alleged predicate acts of mail fraud, wire fraud, and extortion. Importantly, there are adequate remedies for fraud as well as suits to set aside fraudulent instruments under state law to remove a cloud on title. This Court will not follow the Magistrate Judge's lead in reading into RICO a private remedy for a title dispute based on alleged mail or wire fraud or an

extortion scheme by which an adverse title claimant initiates state court litigation to quiet title. The effects of this unwarranted expansion would be profound for the energy industry.

The Court declines the invitation to apply RICO to new purposes for which Congress never intended, and which would be akin to judicially amending the statute.[5] If Congress desired to create a private remedy for state title disputes based on alleged mail or wire fraud or extortion, it could have done so. It did not. Importantly, the RICO statute does not create federal, private remedies for every criminal act in existence. The Magistrate Judge inexplicably concluded otherwise. Accordingly, the R&R is **REJECTED** (Doc. 69), Defendants' Motion is **GRANTED** (Doc. 41), and Plaintiffs' Complaint is **DISMISSED**.

## BACKGROUND

Plaintiffs' claims involve mineral interests in Martin, Ward, and Loving Counties. Plaintiffs trace their ownership of the minerals to certain tax foreclosure sales. Plaintiffs assert Defendants clouded their title to the subject minerals through a "fraudulent and extortionate RICO scheme" by (1) a mail and wire fraud scheme involving the purchase of mineral interests from the successors of the defendants in tax foreclosure suits (Doc. 1 at 11); and (2) an extortion scheme whereby Defendants brought suits against Plaintiffs to adjudicate title to the minerals in state court (*Id.* at 12) ("Ridgefield would then file sham lawsuits raising bogus legal challenges to DOH and Johnson's title."). The purpose of this alleged RICO scheme involving mail and wire fraud and extortion was to acquire and record the mineral deeds, "not to give Ridgefield record title but to fabricate the appearance of a colorable title claim, thereby clouding [Plaintiffs'] valid title and tying up their property, stopping their revenue payments and causing them substantial economic harm, and positioning Ridgefield as a purported rival title claimant for litigation." (*Id.* at 11–12).

---

[5] *See In re Abraham*, 163 B.R. 772, 786–87 (Bankr. W.D. Tex. 1994) ("Statutes should also be interpreted to avoid . . . unreasonable results whenever possible.").

On March 16, 2022, Plaintiffs filed their Complaint, and on May 13, 2022, Defendants moved to dismiss. (Doc. 41). Plaintiffs responded to the Motion to Dismiss on May 27, 2022 (Doc. 44), and Defendants replied on June 3, 2022 (Doc. 45). On September 23, 2022, the Magistrate Judge (Doc. 69) recommended the Motion to Dismiss be denied in part and granted in part (Doc. 41).

In relevant part, Defendants object to the R&R on the following grounds: the Magistrate recommended that this Court deny Defendants' motion to dismiss challenging Plaintiffs' allegations of criminal conduct and racketeering activity, accepting Plaintiffs' *ipse dixit* that the documents at issue were fraudulent and so the mailing/emailing of them constituted mail and wire fraud. But without the "fraudulent" label and the conclusory allegations of mail and wire fraud, Defendants argue that Plaintiffs plead nothing that looks like criminal conduct.

As an initial matter, Defendants claim the state court title disputes "are not frivolous or sham lawsuits." (Doc. 41 at 3). Defendants allege, "Ridgefield is 1 for 1: in *Ridgefield v. Diamondback*, Ridgefield prevailed on its theory that the minerals it acquired were not transferred in a 1999 tax foreclosure and sale because that foreclosure and sale only implicated the royalty interest not the reversionary interest." (*Id.*). Notably, Defendants' Motion to Dismiss was filed a day after the Eastland Court of Appeals rendered its opinion in *Haynes v. DOH Oil Co.*, 647 S.W.3d 793, 803 (Tex. App.—Eastland 2022, no pet. h.), which directly conflicts with *Ridgefield Permian, LLC v. Diamondback E&P LLC*, 626 S.W.3d 357, 361 (Tex. App.—El Paso 2021, pet. filed).

In *Ridgefield v. Diamondback*, the El Paso Court of Appeals concluded that "Appellants' claims to quiet title are not barred by any statute of limitations."[6] However, in *Haynes v. DOH*, the Eastland Court of Appeals held that "Appellant's suit to remove cloud on her title—whether pleaded as an attack on Appellees' title, or a defense of Appellant's own asserted title—is 'an action relating to the

---

[6] 626 S.W.3d at 371.

title to property' and is thus subject to the Tax Code's statute of limitations."[7] The Court notes that the decision of the Eastland Court of Appeals would be binding in this jurisdiction as to state law claims and defenses.[8]

Regardless, the Court finds a legitimate dispute exists as to title. The Texas Constitution states: "***All real property*** and tangible personal property in this State, unless exempt . . . shall be taxed," Tex. Const. art. VIII § 1 (emphasis added). Yet, Defendants argue based on *Ridgefield v. Diamondback* that a possibility of reverter in the mineral estate is a non-taxable interest. Because of the split in authority between the courts of appeals that the Texas Supreme Court has yet to resolve, although not binding on this Court, Defendants have a legitimate basis to prove up their chain of title in the property records and pursue their title claims in state court.

Plaintiffs' allegations that Defendants' title documents are fraudulent merely because they conflict with Plaintiffs' chain of title are conclusory and legally insufficient to avoid dismissal. Accordingly, Defendants' objections to the R&R are **SUSTAINED**. Plaintiffs' objections to the R&R are **OVERRULED**.

On November 28, 2022, the Court construed Defendants' Motion to Dismiss (Doc. 41) as a Motion for Summary Judgment under Rule 56 because it relies on evidence outside the pleadings. The parties submitted summary judgment evidence on December 12, 2022. The parties filed their objections to the summary judgment evidence on December 19, 2022. This matter is now ripe for disposition.

---

[7] 647 S.W.3d at 803.

[8] Most courts of appeals agree with the Eastland Court of Appeals that the one-year statute of limitations bars claims relating to title to property made the subject of a tax sale. *Letner Survivors Tr., LLC v. Berry Grp., LP,* No. 14-20-00822-CV, 2022 WL 1151160, at *2 (Tex. App.—Houston [14th Dist.] Apr. 19, 2022, no pet.) (mem. op.); *Ovation Serv., LLC v. Richard,* 624 S.W.3d 610, 623 (Tex. App.—Tyler 2021, no pet.); *Heidelberg v. DOH Oil Co.,* No. 11-18-00095-CV, 2020 WL 3025919 (Tex. App.—Eastland June 4, 2020, pet. denied) (mem. op.); *Cuanto Antes Major, LLC v. EOG Res., Inc.,* No. 04-17-00504-CV, 2018 WL 1733174, at *8 (Tex. App.—San Antonio April 11, 2018, pet. denied) (mem. op.); *Pickens v. DOH Oil Co.,* 281 S.W.3d 116, 119(Tex. App.—El Paso 2008, pet. denied); *Harrison v. Strauss,* 221 S.W.3d 785, 788 (Tex. App.—Beaumont 2007, pet. denied); *Sessions v. Woods,* 206 S.W.3d 772, 775 (Tex. App.—Texarkana 2006, pet. denied).

## LEGAL STANDARD

Under 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure, a party may serve and file specific, written objections to the proposed findings and recommendations of the magistrate judge within 14 days after being served with a copy of the R&R, and thereby secure a de novo review by the district court. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation in the R&R bars that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[9]

Defendants' Motion to Dismiss was originally filed under Federal Rule of Civil Procedure 12(b)(6). To survive, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[10] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] The Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.[12]

The Court has construed Defendants' Motion to Dismiss as a Rule 56 Motion for Summary Judgment because Defendants attach evidence beyond the Complaint's allegations. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[13] "Only disputes over facts that might affect the outcome of the suit under the governing law" are material and "will properly preclude the

---

[9] *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *United States v. Wilson*, 864 F.2d 1219 (5th Cir. 1989) (per curiam).
[10] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[11] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).
[12] *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).
[13] Fed. R. Civ. P. 56(a).

entry of summary judgment."[14] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[15]

When evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the nonmovant and draws reasonable inferences in the nonmovant's favor.[16] The Court "may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes."[17] Self-serving evidence can create a genuine issue of material fact so long as the evidence is "made on personal knowledge" and "particularized, not vague or conclusory."[18] Further, "[a] non-conclusory affidavit can create genuine issues of material fact that precludes summary judgment even if the affidavit is self-serving and uncorroborated."[19]

The Court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.[20] After due consideration, the Court **SUSTAINS** Plaintiffs' objections to Defendants' summary judgment evidence and **OVERRULES** Defendants' objections to Plaintiffs' summary judgment evidence.

---

[14] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[15] *Id.*

[16] *In re Deepwater Horizon,* 48 F.4th 380, 382 (5th Cir. 2022).

[17] *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (internal quotation omitted).

[18] *Id.* at 160–61 (internal quotation omitted).

[19] *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 288 (5th Cir. 2020).

[20] *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994).

## DISCUSSION

Plaintiffs allege claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Under the civil RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"[21]

To state a claim under the civil RICO statute, a plaintiff must allege (1) an injury[22] to plaintiff's business or property from (2) defendant's violation of one or more provisions of 18 U.S.C. § 1962.[23] Section 1962 has four subsections: §§ 1962(a)–(d). Plaintiffs allege civil RICO violations under three subsections: § 1962(b) (taking control of an enterprise through a pattern of racketeering activity); § 1962(c) (conducting an enterprise's affairs through a pattern of racketeering activity); and § 1962(d) (here, conspiring to violate subsections (b) and (c)).

Section 1962(b) states, "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d) makes it unlawful to conspire to violate the previous subsections of § 1962.

Plaintiffs allege a pattern of racketeering activity based on acts of mail fraud, wire fraud, and extortion. Plaintiffs point to solicitation letters, agreements, and allegedly fraudulent mineral deeds

---

[21] 18 U.S.C. § 1964(c).
[22] Defendants' standing argument is repetitive of their attack on the sufficiency of Plaintiffs' civil RICO claims in that Defendants argue Plaintiffs have failed to establish an injury. So, the Court addresses this claim on the merits.
[23] *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495 (1985).

that were sent through the mail and wires and eventually filed in county records together with the filing of state court lawsuits intending to extort property from Plaintiffs.[24] Plaintiffs claim their alleged injuries "directly flowed from and were a foreseeable consequence of" Defendants' purported actions.[25] According to Plaintiffs, but for some Defendants' fraudulent solicitation of the other named Defendants and their subsequent filing of fraudulent mineral deeds, which led to litigation to determine the rightful owner of the properties, none of Plaintiffs' injuries would have occurred.

### Section 1962(c)

Section 1962(c) makes it unlawful for any employee or associate of an enterprise engaged in interstate or foreign commerce to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. The elements are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[26] Participation in the conduct of an enterprise's affairs requires proof that the defendant participated in the "operation or management" of the enterprise.[27]

Plaintiffs assert that "[w]hile certain members may have had spurts of activity and periods of quiescence while the enterprise pursues [its] fraudulent and extortionate scheme, the enterprise continues to exist to this day, functioning as a continuing unit."[28] Even if Plaintiffs satisfy the other elements of a civil RICO claim, they have failed to properly plead a "pattern" of racketeering activity. Accordingly, the Court will **DISMISS** Plaintiffs' § 1962(c) cause of action without reaching the sufficiency of the other elements.

Predicate acts of racketeering activity are acts that would be "indictable" as one of the federal crimes enumerated in § 1961(1). In this case, Plaintiffs allege two schemes: (1) one based on

---

[24] (Doc. 44 at 37–41, 43, 45–46, 48–53).

[25] (*Id.* at 9).

[26] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

[27] *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

[28] (Doc. 44 at 14).

mail and wire fraud relating to conduct Defendants engaged in as between themselves and third parties unrelated to Plaintiffs; and (2) one based on extortion where Defendants sought to purchase or acquire Plaintiffs' mineral interests through settlement discussions relating to alleged sham litigation.

Defendants argue that Plaintiffs failed to plead a pattern of racketeering activity as defined by RICO for three reasons: 1) Plaintiffs essentially allege an extortion scheme involving the filing of malicious lawsuits, which cannot constitute a predicate act for civil RICO purposes; 2) Plaintiffs fail to allege "continued criminal activity" as to the non-Ridgefield Defendants and thus have not pleaded continuity, a requirement for showing a pattern of racketeering activity; and 3) Plaintiffs fail to meet the standards of Federal Rule of Civil Procedure 9(b) because they have not "allege[d] receiving mail or wire from any Defendant." (Doc. 41 at 9–12). In response, Plaintiffs assert: 1) because they allege mail fraud, wire fraud, and extortion, along with "malicious litigation activities," Plaintiffs have sufficiently alleged a pattern of racketeering; 2) "Defendants have continued to collectively issue repeated extortionate threats [of litigation]"; and 3) there is no requirement that Plaintiffs plead that they were deceived or misled in order to sufficiently plead mail or wire fraud. (Doc. 44 at 10–13).

The heightened pleading standards for fraud under Federal Rule of Civil Procedure 9(b) apply to the alleged predicate crimes underlying a civil RICO claim. According to Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). For the sake of this analysis, the Court will assume, without deciding, that each predicate fraud is properly pleaded under Rule 9(b).

At a bare statutory minimum, a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a

prior act of racketeering activity."[29] But "a pleading that sufficiently alleges a RICO 'pattern' must include allegations that demonstrate both 'relatedness' between the predicates and a threat of 'continuing racketeering activity.'"[30] A plaintiff may establish relatedness by "showing that acts have the 'same or similar purposes, results, participants, victims, or methods of commission.'"[31]

## A.      Mail and Wire Fraud Scheme

Assuming without deciding each of the predicate frauds is properly pleaded, Plaintiffs' RICO claims fail because the alleged frauds do not establish a pattern of racketeering activity. Plaintiffs allege Defendants used the mail and wires to conduct business among themselves, exchanging offers, acceptances, title documents, and payments. In other words, Plaintiffs seek to show a pattern of racketeering activity by interweaving their own alleged injuries from an extortion scheme together with purportedly fraudulent actions directed toward others:

- Defendant Ridgefield mails out generic solicitation letters offering to purchase the interests of the potential owners at a certain price per acre (Doc. 1 at 6);

- When the terms of the deal are agreed upon, the seller executes the mineral deed and emails the broker a scanned copy of it (*id.* at 7);

- The broker then emails the scanned deed to Defendant Ridgefield (*id.*);

- After the seller receives the payment, it mails the original executed deed to Defendant Ridgefield's broker (*id.*);

- Defendant Aaron Kahle instructs the broker to mail the deed to the appropriate county clerk's office for recording in the public records (*id.*);

- Defendant Aaron Kahle sent an email advising Defendant Steve Kerrigan that the foreclosure judgment was a non-issue (*id.*);

- On April 4, 2018, Defendant Stephen Yerkovich emailed a copy of the Reed mineral deed to EOG Resources, Inc., the operator of the Section 14 wells, and asked to hold the interest in suspense (*id.* at 10);

---

[29] 18 U.S.C. § 1961(5).
[30] *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 693 (E.D. Tex. 2020) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989)).
[31] *Id.*

- On June 27, 2019, Defendant Ridgefield mailed a new letter to Samuel Brenner, predecessor to Defendant C. Megan Brenner, about a "legal issue burdening your interest" in Section 14 (*id.* at 13);

- Defendant Ridgefield mailed the agreement to Samuel Brenner, predecessor to Defendant C. Megan Brenner, along with a copy of a mineral deed purportedly conveying one-fourth of his interest in Section 14 to Defendant Ridgefield (*id.*);

- Samuel Brenner, predecessor to Defendant C. Megan Brenner, executed the agreement and mineral deed on October 2, 2019, and mailed the executed originals to Defendant Ridgefield (*id.*);

- Defendant Ridgefield mailed a revised offer letter to Defendants Barbara Sue O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust; Richard K. O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust on July 29, 2019 (*id.*);

- On August 12, 2019, Defendant Ridgefield mailed Defendants Barbara Sue O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust; Richard K. O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust an agreement memorializing this deal along with a mineral deed purportedly conveying one-half of their mineral interest in Section 14 to Defendant Ridgefield and they mailed the executed originals to Defendant Ridgefield (*id.* at 14);

- On September 19, 2019, Defendant Ridgefield mailed Defendants Barbara Sue O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust; Richard K. O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust a check for the agreed amount of $40,000 for the mineral deed (*id.*);

- At Defendant Aaron Kahle's direction, the original executed mineral deed was delivered to the Loving County Clerk's office and recorded on January 14, 2020 (*id.*);

- Samuel Brenner, predecessor to C. Megan Brenner, and Defendants Barbara Sue O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust; Richard K. O'Neil, Individually and as Co-Trustee of the O'Neil Family Mineral Trust executed the engagement letter and returned the executed versions to Defendant Ridgefield (*id.* at 15);

- Defendant Aaron Kahle referred to the scheme as the "Tax Foreclosure project" by email (*id.*);

- On December 11, 2019, Defendant Aaron Kahle sent an email with the subject line "Spreadsheets for DOH Oil Prospects" about a spreadsheet of "tax foreclosure opportunities against DOH Oil" (*id.* at 16);

14

- In September and October 2019, Defendant Ridgefield mailed out solicitation letters to the persons Defendant Aaron Kahle had identified as heirs of the foreclosed owners in Sections 3, 13, and 95 (*id.*);

- Throughout 2020 and into early 2021, Defendant Ridgefield closed with several of these parties and obtained mineral deeds from them. Once Defendant Aaron Kahle approved title and Defendant Steve Kerrigan approved financing, Defendant Ridgefield then mailed the check for the agreed purchase price for delivery to the grantor. In one case, Defendant Ridgefield paid the purchase price by international wire transfer. Defendant Stephen Yerkovich authorized several of these payments and typically emailed copies of the processed checks to Tomahawk. The grantor typically then mailed the originals of the executed agreement and mineral deed. On Defendant Aaron Kahle's instructions, the original mineral deeds were mailed to the respective county clerks' offices for recording (*id.* at 17).

- Those that purported to convey partial interests and agreed to participate in Defendant Ridgefield's sham litigation include Section 13 claimants Defendants Robert Pike and David Pike, and Section 3 claimants and Defendants Jim Hall, Jerry Larson as predecessor to Defendant Donna Larson, and Defendant Albert Benjamin Ramsey. Defendant Ridgefield's outside counsel mailed or emailed these parties engagement agreements containing substantially the same terms as those of the Section 14 litigants, which the recipients executed and returned by mail or email (*id.* at 18).

- Defendant Ridgefield's outside counsel also mailed or emailed Defendant Donna Larson an engagement agreement containing substantially the same terms as those with the other Section 3 litigants, which she executed and returned by mail or email (*id.*).

- On September 26, 2019, Defendant Aaron Kahle emailed Defendant Steve Kerrigan, Defendant Stephen Yerkovich, and other Defendant Ridgefield personnel concerning the interest formerly owned by Lula Eades, one of the foreclosed owners in Section 3 of Loving County. Unlike some of the other foreclosed owners, Eades owned not a possessory mineral interest but a non-participating royalty interest ("NPRI"). In the email, Defendant Aaron Kahle acknowledged that Eades's NPRI was foreclosed upon and sold to Plaintiff DOH, and Defendant Aaron Kahle wanted to target it in the Tax Foreclosure Project because a particularly good oil well was producing in Section 3 (*id.* at 19);

- On September 5, 2019, Defendant Aaron Kahle emailed spreadsheets to Defendants Steve Kerrigan, Stephen Yerkovich, and other Defendant Ridgefield employees showing "all interests included in the mass tax foreclosures in Reeves and Ward Counties that occurred in the late 1990's" (*id.* at 20);

- In an internal email dated October 5, 2020, Defendant Stephen Yerkovich told Defendants Aaron Kahle, Steven Kerrigan, and other employees that he had approved the funding request for the "tax foreclosure interest" of one of the Section 95 mineral deed grantors (*id.*).

Notably, none of the above-described actions was directed toward Plaintiffs but instead took place between Defendants and third parties.

**B.    Extortion Scheme**

Next, Plaintiffs claim Defendants sent Plaintiffs written settlement demands implying that if Plaintiffs refused to capitulate to Defendants' adverse claims of title, Defendants would acquire mineral deeds and file litigation for a title determination on the disputed property interests. Plaintiffs also allege Defendants engaged in sham litigation in state court to steal Plaintiffs' property rights:

- The first lawsuit concerned the Section 14 interests. It was filed by Defendants Ridgefield, the O'Neil Trust, and Samuel Brenner, predecessor to Defendant C. Megan Brenner, against Plaintiff DOH and its managing partner David Hill in Loving County district court on January 23, 2020. In connection with that suit, Defendant Ridgefield recorded a lis pendens notice in the Loving County Official Public Records on April 2, 2020. Defendant Stephen Yerkovich emailed a copy of the notice of lis pendens to EOG Resources, the operator of the Section 14 wells, on April 17, 2020. Defendant C. Megan Brenner was substituted for Samuel Brenner in December 2020 (Doc. 1 at 23);

- Defendant Ridgefield's second suit concerned the Section 95 interests. It was filed by Defendant Ridgefield against Plaintiff DOH, Hill, and Plaintiff Craig A. Johnson in Ward County district court on July 30, 2020 (*id.*);

- Defendant Ridgefield followed up the Ward County suit with two more suits against Plaintiff DOH and Hill in Loving County—one covering Section 3 and one covering Section 13. Both were filed on August 24, 2020. The Section 3 suit included partial grantors Defendants Jim Hall, Jerry Larson predecessor to Defendant Donna Larson, and Albert Benjamin Ramsey as Ridgefield's co-plaintiffs. Donna Larson was substituted for Jerry Larson in July 2021. The Section 13 suit included partial grantors Robert Pike and David Pike as Ridgefield's co-plaintiffs (*id.*);

- In all four lawsuits, Defendant Ridgefield and its co-plaintiffs sought title to the interests owned by Plaintiff DOH, damages from both the operator and Plaintiff DOH, and an order disgorging Plaintiff DOH of all revenues it had received. The Ward County suit sought the same remedies against Plaintiff Craig A. Johnson as Plaintiff DOH's partial assignee (*id.*);

- Because of the lawsuits, the operators of Plaintiff DOH and Plaintiff Craig A. Johnson's interests suspended their revenues attributable to the subject minerals (*id.*)

- On September 23, 2020, before Plaintiff DOH and David Hill had even appeared in Ridgefield's third and fourth lawsuits, Defendant Ridgefield's outside counsel sent them a written settlement demand "to put all issues between Ridgefield et al and DOH to bed." The demand was also sent on behalf of Samuel Brenner and the O'Neil trust, Defendant

Ridgefield's co-plaintiffs in the Section 14 lawsuit, and Defendants Albert Ramsey, Jim Hall, and Jerry Larson, Defendant Ridgefield's co-plaintiffs in the Section 3 lawsuit (*id.* at 30);

- Following a hearing in Loving County on September 8, 2021, Defendant Ridgefield's counsel approached Plaintiff DOH's counsel and informed him that Defendant Ridgefield had "found another tax foreclosure" in which Plaintiff DOH purchased the foreclosed interests, this time in Martin County. Defendant Ridgefield's counsel said that Defendant Ridgefield was working on acquiring mineral deeds from the foreclosed owners and intended to file suit, but it wanted to know if Plaintiff DOH was interested in "resolving their differences" on the same terms as its prior demand (*id.* at 30);

- The next day, Defendant Ridgefield's counsel forwarded more information about the Martin County tax suit, stated that Defendant Ridgefield had either acquired or reached agreements to acquire mineral deeds from the foreclosed owner's heirs, and again asked if Plaintiff DOH was interested in "a global settlement" (*id.* at 31);

- On September 22, 2021, Defendant Ridgefield's counsel emailed Plaintiff DOH's counsel seeking to confirm that "settlement talks between our clients towards some sort of resolution have reached an end point" (*id.*);

- On November 11, 2021, Defendant Ridgefield's counsel sent a settlement demand letter covering the four existing lawsuits, plus the Martin County interests. It was sent on behalf of Defendant Ridgefield, its co-plaintiffs, as well as three more parties in the threatened Martin County litigation—Defendants Victor Green, Laura Peters, and Dawn Gee (*id.* at 31);

- On November 18, 2021, Defendant Ridgefield's counsel asked Plaintiff DOH's counsel if Plaintiff DOH was ready to discuss the settlement demand (*id.*);

- On November 29, 2021, Plaintiff DOH's counsel informed Defendant Ridgefield's counsel that Plaintiff DOH had no response and did not see the need to discuss the demand (*id.* at 32);

- On December 1, 2021, Defendant Ridgefield filed its fifth lawsuit against Plaintiff DOH in Martin County district court. In it, Defendant Ridgefield and its co-plaintiffs Defendants Victor Green, Laura H. Peters, and Dawn E. Gee claimed title to the Section 37 interests that were foreclosed upon in 1994 and conveyed to Plaintiff DOH under its 1995 special warranty deed. They also seek damages from both the operator and Plaintiff DOH, and an order disgorging Plaintiff DOH of all revenues it has received (*id.*).

As shown above, the only actions of Defendants that Plaintiffs claim were directed at them include the filing of title litigation and attempts to settle these title disputes.

**C.      Plaintiffs Fail the Relationship Test**

The relationship requirement is satisfied by showing that the predicate acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. As described above, Plaintiffs allege two schemes: (1) mail and wire fraud based on Defendants' communications with each other and third parties and (2) extortion based on Defendants' attempts to settle the allegedly sham lawsuits or acquire Plaintiffs' mineral interests.

**1.      Purpose**

The mail and wire fraud scheme between Defendants and themselves or third parties to buy and sell minerals separate and distinct from Plaintiffs' adverse chain of title, file mineral deeds in the county records, or notify operators of a title dispute is unrelated under RICO to the extortion scheme whereby Defendants sought to settle the allegedly sham litigation with Plaintiffs. Notably, none of the mail and wire fraud conduct targeted Plaintiffs. Instead, this conduct was directed toward ultimate sellers of purported mineral interests between Defendants and non-parties. This conduct has separate and unrelated purposes to any conduct directed at Plaintiffs relating to settlement efforts in pending state court title litigation. In the case of the direct mail solicitations and resulting email correspondence between Defendants and third parties, Defendants' purposes were to buy and sell certain purported mineral interests independent of Plaintiffs' adverse chain of title. None of this conduct had the similar or related purpose of inducing Plaintiffs to make a contract with Defendants to sell their mineral interests or forcing Plaintiffs to relinquish their property rights.

**2.      Result**

Further, the alleged mail and wire fraud conduct between Defendants and third parties yields a different result than any extortionate conduct directed toward Plaintiffs. Defendants sought to transfer mineral interests between themselves to establish an independent chain of title apart from

Plaintiffs' claim to the minerals, resulting in an exchange of mineral interests distinct from Plaintiffs' ownership.

### 3.        Participants and Victim

Plaintiffs are only an alleged victim of a purported extortion scheme to directly acquire Plaintiffs' property interests. Plaintiffs allege Defendant Ridgefield committed acts of attempted extortion involving: (1) demands that Plaintiffs DOH and Johnson stipulate that Defendant Ridgefield owns part of their property in exchange for dismissing sham lawsuits; (2) threats to continue acquiring more invalid mineral deeds and filing more sham litigation on other DOH property if Plaintiff DOH did not capitulate; and (3) the sending of the invalid mineral deeds and lis pendens notice to operators try to injure Plaintiff DOH economically by causing its revenue payments to be suspended. (Doc. 1 at 43). Plaintiffs also claim Defendant Ridgefield's attempted extortion include the filing of its sham lawsuits and its abusive, bad-faith litigation activities throughout those lawsuits.

In other words, the mineral interests involved in the alleged mail and wire fraud scheme were derived from Defendants' separate—whether invalid or not—chain of title, and thus could not have been directed at Plaintiffs. Plaintiffs cannot complain about purchase and sale agreements between Defendants independent of Plaintiffs' title because they involve different participants. The Court does not hold that a civil RICO plaintiff must necessarily be directly harmed by all alleged predicate acts, as harm from one enumerated violation may, in some cases, be sufficiently connected. The Court's conclusion merely reflects that Plaintiffs, under these circumstances, may not use unrelated predicate acts that allegedly harmed Defendants or third parties not similarly situated to Plaintiffs.

### 4.        Methods of Commission

While the extortion scheme was purportedly accomplished through sham litigation and the solicitation of contracts or settlements directly with Plaintiffs, the scheme of mail and wire fraud by which Defendants sought to buy and sell each other's interests does not preclude Plaintiffs from asserting their independent property rights based on their adverse chain of title. The bare allegation that Defendants used wire and mail fraud in an otherwise dissimilar scheme does not in this instance satisfy the relationship prong of the pattern test. To form a pattern, all predicate actions must have a relationship to one another. The first group of allegations based on mail or wire fraud did not harm, nor did they threaten to harm, Plaintiffs.

In sum, the alleged fraud directed at or between Defendants and third parties is insufficiently related to the extortion against Plaintiffs and does not constitute a pattern of racketeering activity. The fraudulent scheme involving Defendants and third parties have dissimilar purposes from any conduct directed at Plaintiffs. The victims are different; the methods of commission are distinct. In the purported fraudulent scheme, Defendants sought to buy and sell mineral interests with each other and inform third parties of these transactions independent of Plaintiffs' chain of title. In the extortion scheme, Defendants allegedly sought to extort Plaintiffs of their mineral interests. Although both schemes involve mineral interests, the procedures differ. Thus, the schemes are not interrelated. They may have the same general subject matter—here, mineral interests—but the two schemes are isolated and do not coalesce into a broader pattern of racketeering activity.

Accordingly, Plaintiffs cannot rely on their allegations of a mail and wire fraud scheme to establish a pattern of racketeering activity. Without mail and wire fraud, the predicate acts relate, at most, to a single ploy of extortion involving Defendants' attempt to purchase Plaintiffs' mineral interests to resolve purported sham litigation. Thus, the Court **REJECTS** the Magistrate Judge's recommendation as to the relationship requirement.

### D.    Plaintiffs Fail the Continuity Test

Plaintiffs may not complain about conduct which did not harm them under the guise of RICO continuity, unless those improper acts directed toward others are functionally related to the acts which harmed Plaintiffs. A civil plaintiff may not use one type of conduct (acts directed toward Plaintiffs) to satisfy the relationship test, and then invoke a second type of conduct (acts directed between Defendants and third parties) to fulfill the continuity test absent similarities among the types of conduct and the victims who are essentially in the same position. Only predicate acts that are related to each other may be used to satisfy both prongs of the relationship-plus-continuity test.

As to the continuity of the alleged activity, the United States Court of Appeals for the Fifth Circuit has juxtaposed "open-ended patterns" and "close-ended patterns" of racketeering activity.[32] The difference between the patterns is that an open-ended pattern "has no strict temporal requirement," while a close-ended pattern takes place "over a long period of time."[33]

As an initial matter, Defendants Barbara Sue O'Neil and Richard K. O'Neil, Individually and as Co-Trustees of the O'Neil Mineral Trust; C. Megan Brenner; Robert Pike; David Pike; Jim Hal; Donna Larson; Albert Benjamin Ramsey; Victor Green; Laura Holmes Peters; and Dawn Enright Gee, are each a party to a single lawsuit. Plaintiffs have failed to plead continued criminal activity with respect to these defendants.

Without mail and wire fraud as predicate crimes, the pattern of activity involving Defendants seeking to purchase or acquire Plaintiffs' mineral interests to resolve the allegedly sham litigation was too ephemeral to reasonably be considered a close-ended pattern. Nor could it be an open-ended pattern, as the extortion was not Defendants' normal way of doing business or continuing in nature. Plaintiffs' claims thus fail the continuity test. Accordingly, the Court **REJECTS** the Magistrate Judge's recommendation as to the continuity test.

---

[32] *ESPOT, Inc.*, 492 F. Supp. 3d at 693.
[33] *Id.* (citing *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)).

1.      **Open-Ended RICO Pattern**

To establish an open-ended RICO pattern, a plaintiff must show "either that the predicate acts establish a 'specific threat of repetition extending indefinitely into the future' or 'that the predicates are a regular way of conducting the defendant's ongoing legitimate business.'"[34] Here, Plaintiffs fail the relationship-plus-continuity test.

Plaintiffs have not successfully pleaded an open-ended pattern of racketeering activity. The predicate acts themselves could "include a specific threat of repetition extending indefinitely into the future," or "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."[35] In this case, Plaintiffs do not establish a distinct threat of perpetual or repeated racketeering activity. *Id.* First, any attempt on the part of Defendants to extort Plaintiffs terminated when Plaintiffs rejected Defendants' offer to acquire Plaintiffs' mineral interests in settlement of the state court title litigation. By that time, Plaintiffs had ceased communicating with Defendants outside the context of litigation and were unlikely to conduct business together. There likewise are no factually supported contentions here that Defendants would reasonably re-enter business negotiations with Plaintiffs. Second, the settlement communications were solely targeted at Plaintiffs to resolve a title dispute, which inevitably, will conclude upon final judgment in state court.

Presumably, the racketeering activity ceased following the abatement of the state court litigation. The acts did not include a specific threat of repetition extending indefinitely into the future, since the doctrine of res judicata would apply to future title disputes. *Id.* The scheme was thus inherently terminable with an incorporated ending point at which time the state courts would decide who holds superior title to the disputed interest. And once there is a final title determination, the operator will cease suspending royalties and pay revenue to whomever the Court determines to

---

[34] *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Sawyer*, 90 F.3d at 122).
[35] *H.J. Inc.*, 492 U.S. at 242.

be the superior title owner. Receiving a judgment that determines title extinguishes the motivation driving the scheme and releases any suspended royalties.

Nor do Plaintiffs establish that racketeering was part of an ongoing entity's regular way of doing business. Plaintiffs make no allegation that Defendants have perpetrated any frauds unconnected to a dispute over whether Plaintiffs or Defendants hold superior title to the disputed minerals. Plaintiffs may speculate in their briefs that they are victims of a continuing scheme, but this unfounded speculation cannot properly plead an open-ended pattern.

Here, the scheme to buy and sell mineral interests among Defendants and any attempt to seek a resolution to a title dispute between Defendants and Plaintiffs are not closely related enough to be counted together as a pattern of racketeering activity. Instead, this is a single isolated alleged scheme driven by Defendant Ridgefield's desire to quiet title to the disputed mineral interest. As a result, the scheme was not indefinite, and it was not Defendants' regular way of doing business. Accordingly, the Court **REJECTS** the Magistrate Judge's recommendation as to an open-ended RICO pattern.

### 2.     Close-Ended RICO Pattern

The Magistrate Judge recognized the existence of close-ended RICO patterns but did not consider whether Plaintiffs had successfully pleaded one. (Doc. 69 at 9–11). To successfully plead a close-ended pattern of racketeering activity, Plaintiffs must allege "a series of related predicates extending over a substantial period of time."[36] "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]"[37] Plaintiffs allege Defendants' scheme began in 2018 and continued through 2021. But the alleged wire and mail fraud relating to Defendants' attempts to buy and sell mineral interests among themselves cannot substantiate this pattern. Thus, the Court is left to consider only the extortion scheme. This

---

[36] *H.J. Inc.*, 492 U.S. at 242.

[37] *Id.*

subterfuge purportedly began when Defendant Ridgefield recorded a lis pendens notice in the Loving County Official Public Records on April 2, 2020.

When did Defendant Ridgefield's alleged scheme end? As noted in the preceding allegation chronicling, Defendant Ridgefield filed its last quiet title lawsuit against Plaintiff DOH on December 1, 2021. Thus, the extortion scheme appears to have endured for 20 months. In *United States v. Thompson*, 253 F.3d 700 (5th Cir. 2001), the Fifth Circuit recognized a scheme lasting approximately 21 months. In *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007), the Fifth Circuit recognized a scheme lasting 25 months. In *Ambulatory Servs. of P.R., LLC v. Sankar Nephrology Grp., LLC*, 2019 WL 4192738 (N.D. Tex. Sept. 3, 2019), the district court recognized a scheme lasting 29 months. However, close-ended RICO schemes typically span an amount of time significantly longer than two years. In *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995), the Fifth Circuit recognized a scheme lasting four years. In *Megatel Homes, LLC v. Moayedi*, 2021 WL 5325919 (N.D. Tex. Nov. 16, 2021), the district court recognized a scheme lasting five years.

The Court finds that the extortion scheme related to the filing of alleged sham litigation, notifying operators of title disputes, and seeking to settle these claims between Plaintiffs and Defendants is too short to constitute a close-ended pattern of racketeering activity and merely reflects the typical time frame for resolving title litigation in state court. Thus, Plaintiffs' RICO claims under § 1962(c) fail the relationship-plus-continuity test and they shall be **DISMISSED**.

### Section 1962(b)

Plaintiffs also allege violations of § 1962(b). Section 1962(b) makes it unlawful for "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce." To recover under this section, a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, along with injury from the predicate acts. Such an injury may be

shown, for example, where the owner of an enterprise infiltrated by the defendant through racketeering activities is injured by the defendant's acquisition or control of his enterprise. In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the defendant is due to racketeering. Simply showing that a person engaged in racketeering has an otherwise legitimate interest in an enterprise is not enough. Rather, it must be firmly established that there is a nexus between the legitimate interest and the alleged racketeering activities.

Particularly relevant to this claim is the requirement that Plaintiffs allege a RICO injury on top of injury from the predicate acts. The purpose of § 1962(b) was to prevent racketeers from using ill-gotten gains to operate or acquire control of legitimate businesses.[38] The classic example of a § 1962(b) injury is where the owner of a legitimate business is injured by infiltration of the business by racketeering activity like loan sharking or extortion.[39] In other words, under § 1962(b), "plaintiffs must allege an 'acquisition' injury;" i.e., that their injury "was caused by the acquisition of an enterprise."[40]

Plaintiffs fail to show injury from Defendants' acquisition or control of an interest in a RICO enterprise on top of injury from the predicate acts. Plaintiffs have not alleged that any Defendant took or exercised control of the enterprise through racketeering activity. There is no evident acquisition injury. For example, if Defendants had infiltrated an enterprise owned by Plaintiffs through racketeering activities and Defendants' acquisition or control of their enterprise injured Plaintiffs, Plaintiffs could conceivably plead a § 1962(b) claim. But Plaintiffs don't make this allegation.

Plaintiffs allege that Defendants comprise an association-in-fact enterprise with the "common purpose of depriving [Plaintiffs] of their property by fabricating the appearance of

---

[38] *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 700 (S.D. Tex. 2010).

[39] *F/V Robins Nest, Inc. v. Atl. Marine Diesel, Inc.*, No. 92-3900, 1994 WL 594592, at *5 (D.N.J. Oct. 14, 1994).

[40] *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991).

colorable title in [Defendant] Ridgefield under the fraudulent mineral deeds, clouding [Plaintiffs']
record title and causing them substantial economic harm, and positioning [Defendant] Ridgefield to
bring sham lawsuits on behalf of itself and its co-plaintiff grantors to extort [Plaintiffs] into
conveying part of their property to [Defendant] Ridgefield and its state court co-plaintiffs." (Doc. 1
at 35–36). Plaintiffs also contend that Defendants have an ongoing relationship that involved
"execut[ing] invalid mineral deeds" and filing lawsuits against Plaintiffs. (*Id.* at 35). Finally, Plaintiffs
claim the alleged extortionate scheme will continue as shown in the settlement demand letters. (*Id.* at
31).

In total, the alleged enterprise includes Defendant Ridgefield and the individual Defendants
through purchase and sale agreements between themselves to buy and sell mineral interests.
Notably, Defendants existed before any alleged predicate acts occurred. Defendants have legitimate
interests in their own companies or property rights and Plaintiffs do not assert irregularity in how
Defendants bought and sold their mineral interests among themselves.

Plaintiffs' § 1962(b) claim is merely a restatement of their § 1962(c) claim. They have not
attempted to argue any injury from Defendants' alleged acquisition or control of an interest in a
RICO enterprise *along with injury from the predicate acts*. Therefore, Plaintiffs' § 1962(b) claims are
**DISMISSED,** and the Court **REJECTS** the Magistrate Judge's recommendation on this ground.

### Section 1962(d)

Section 1962(d) establishes conspiracy liability under RICO. The statute makes it "unlawful
for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this
section." 18 U.S.C. § 1962(d). To plausibly state a claim for a violation of § 1962(d), plaintiffs must
successfully allege all the elements of a RICO violation, as well as assert the existence of an illicit
agreement to violate the substantive RICO provision. Because, as discussed above, Plaintiffs have
not successfully alleged all the elements of a RICO violation, Plaintiffs can maintain no conspiracy

claim under § 1962(d). Thus, Plaintiffs' § 1962(d) claims must be **DISMISSED** and the Magistrate Judge's recommendation to the contrary is **REJECTED**.

### State Law Claims

Because Plaintiffs' RICO claims must be dismissed, their other claims may also be dismissed. Plaintiffs believe federal subject matter jurisdiction is appropriate solely on account of federal questions arising under 18 U.S.C. §§ 1961 *et seq*. The question now is whether the Court should exercise its discretion and maintain supplemental jurisdiction over Plaintiffs' remaining state law claims. District courts may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Court may raise this issue sua sponte.

In determining whether to retain jurisdiction over state law claims, district courts weigh several factors, including the values of judicial economy, convenience, fairness, and comity.[41] When all federal claims are dismissed before trial, the balance of considerations usually will lean toward dismissing the state law claims. If the federal claims are dismissed before trial, state law claims generally should be dismissed as well.

Nothing here weighs against the Court's general practice of dismissing the state claims without prejudice. Dismissal would be economically efficient and would respect the States' interest in deciding claims arising under their own laws. Accordingly, the R&R is **REJECTED,** and the state law claims are **DISMISSED**. Because the Complaint is **DISMISSED**, all hearings in this matter are thus **VACATED** and all other motions are **DENIED** as moot.

### CONCLUSION

With the tide of energy litigation rising in response to the gravitational pull of the oil boom, state courts efficiently play referee to these title games. This Court will neither comment upon nor

---

[41] *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988).

determine the propriety of how to resolve title questions under state law. Nor does this Court wish to deter parties from zealously asserting their mineral ownership rights through litigation. Accordingly, the Court **REJECTS** the Report and Recommendation of the Magistrate Judge (Doc. 69) and **GRANTS** Defendants' Motion. (Doc. 41).

It is hereby **ORDERED** that Plaintiffs' RICO claims are **DISMISSED WITH PREJUDICE** and the Magistrate Judge's Report and Recommendation (Doc. 69) is **REJECTED**.

It is further **ORDERED** that because the Court declines to exercise supplemental jurisdiction over the state law claims, all other claims are **DISMISSED WITHOUT PREJUDICE**.

It is further **ORDERED** that any hearings in this matter are **VACATED**.

It is further **ORDERED** that all pending motions are **DENIED** as moot.

It is finally **ORDERED** that the Clerk of the Court **CLOSE** this case.

It is so **ORDERED**.

SIGNED this 4th day of January, 2023.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE